1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

8
9
10

MATTHEW R. WATTS,                          CV F 06-00809 DLB HC

11
            Petitioner,                    ORDER DENYING PETITION FOR WRIT OF
                                           HABEAS CORPUS AND DIRECTING CLERK
12      v.                                 OF COURT TO ENTER JUDGMENT IN
                                           FAVOR OF RESPONDENT
13
JAMES A. YATES,                            [Doc. 1]
14
            Respondent.
15   _____/

16

17      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.   Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to

19   the jurisdiction of the United States Magistrate Judge.

20                                    BACKGROUND

21      Following a bench trial in the Madera County Superior Court, Petitioner was convicted of

22   one count of carjacking (Cal. Pen. Code § 215(a)),[1] one count two of attempted carjacking (§§

23   664/215(a)), one count three of grand theft of a firearm (§ 487(c)), and one count four of arson of

24   an inhabited structure (§ 451 (b)).  It was further alleged that during the commission of counts

25   one and two, Petitioner used a firearm within the meaning of section 1203.06(a)(1) and

26   12022.5(a)(2).  On January 9, 2004, the court sentenced Petitioner to thirteen years six months in

27
28
_____
[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1    state prison.[2]  (CT 106-107.)[3]

2        Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth

3    Appellate District.  (Lodged Doc. No. 1.)  On June 28, 2005, the judgment was affirmed.

4    (Lodged Doc. No. 4.)

5        Petitioner filed a petition for review with the California Supreme Court on July 29, 2005.

6    The petition was denied on August 31, 2005.  (Lodged Doc. No. 5.)

7        Petitioner filed the instant federal petition for writ of habeas corpus on June 26, 2006.

8    (Court Doc. 1.)

9        Respondent filed an answer to the petition on November 14, 2006, and Petitioner filed a

10   traverse on December 29, 2006.  (Court Docs. 11, 15.)

11                              STATEMENT OF FACTS

12       On May 28, 2003, at 8:00 a.m., as Renae Smith arrived at the parking lot of her place of

13   employment, and got out of her truck and shut the door, she heard a voice say, "Give me your

14   keys and your cell phone."  (RT 1257-1260.)  She immediately turned around and saw Petitioner

15   holding a gun in his hand.  (RT 1260, 1263.)  She started to walk away toward the tailgate of the

16   truck, and Petitioner repeated his demand to give her the keys, to which she responded "[f]orget

17   you."  (RT 1262.)  Her husband Russell Smith arrived and shoved Renae behind him and took

18   over the conversation with Petitioner.  Petitioner continued to move toward them stating that he

19   needed to get out of there.  (RT 1264, 1281, 1286-1287.)  Russell had left his vehicle running and

20   the door open, which Petitioner entered and drove away in.  (RT 1264.)

21       After subsequently viewing a photo lineup, Russell recognized that he knew Petitioner

22   from high school.  (Rt 1284, 1289.)

23       Shannon Hard testified that he had known Petitioner for approximately fourteen or fifteen

24   _____

25       [2] Petitioner was sentenced as follows: Count one - five years; count two - ten months; count three - eight

26   months; count four - one year, eight months.  Count One was designated as the principal term; sentence on counts
     two through four was ordered to run consecutive to count one.  Petitioner received an additional four years for the

27   section 12022.5(a) enhancement on Count One, and an additional one year and four months for the section
     12022.5(a) enhancement on Count Two.  (CT 105.)

28       [3] "CT" refers to the Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal.

years.  (RT 1295.)  In May of 2003, Hard allowed Petitioner to live on a piece of property he owned.  Petitioner asked Hard if he could provide him with a weapon for his protection from wild animals while he was on the property.  (RT 1291-1292.)  Hard showed Petitioner a .45 caliber semi-automatic pistol that he owned; however, Hard had no intention of lending it to Petitioner.  (RT 1293.)  Later that day, Hard discovered that his gun was missing after Petitioner had left the property.  Hard did not give Petitioner permission to take his weapon.  (RT 1294.)

On May 30, 2003, California Department of Forestry Investigator Greg Grizzell investigated a fire that occurred at a trailer owned by Petitioner's father, Tony Watts.  (RT 1226-1227.)  When he arrived at the scene, the trailer was engulfed in flames and it was completely destroyed by the fire.  (RT 1226.)  It was determined that the fire was caused by arson.  (RT 1227-1230.)

Petitioner was interviewed by Madera County Sheriff's Detective Jack Wayman, at the Madera County jail.  (RT 1241.)  After being advised of his Miranda[4] rights, Petitioner admitted to the carjacking and the arson of his father's trailer.  (RT 1244-1246.)

Defense

Petitioner's stepfather, Richard Regert, testified that in May of 2003, Petitioner was driving a 1978 Ford 4x4.  The vehicle was legally registered and had proper tags.  (RT 1316-1317.)  Regert testified that he noticed a substantial change in Petitioner's demeanor after he was previously released from custody.  (RT 1318.)  He opined that Petitioner was not the same person.  (RT 1319.)

Petitioner testified on his own behalf.  (RT 1320.)  Petitioner testified that he believed his father had placed a camera in his eye and talked to him when he was previously in jail.  (RT 1322.)  Petitioner stated that he took the gun, without permission, from Shannon Hard in order to rob a bank to get money to go to China.  (RT 1322-1323.)  Petitioner admitted to carjacking the Smiths using an unloaded weapon to scare them.  He dumped their belongings out of the car and took $20 from Russell's wallet.  (RT 1325.)

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

1    Petitioner also admitted that he set his father's trailer on fire.  (RT 1326.)

2                                    DISCUSSION

3    A.    Jurisdiction

4          Relief by way of a petition for writ of habeas corpus extends to a person in custody

5    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

6    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

7    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

8    violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

9    out of the Madera County Superior Court, which is located within the jurisdiction of this Court.

10   28 U.S.C. § 2254(a); 2241(d).

11         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

12   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

13   enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

14   F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

15   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

16   1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

17   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

18   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

19   B.    Standard of Review

20         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

21   custody pursuant to the judgment of a State court only on the ground that he is in custody in

22   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

23         The AEDPA altered the standard of review that a federal habeas court must apply with

24   respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

25   Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

26   will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

27   to, or involved an unreasonable application of, clearly established Federal law, as determined by

28   the Supreme Court of the United States;" or "resulted in a decision that was based on an

                                            4

unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.     Trial Court's Refusal to Suspend Criminal Proceedings

Petitioner contends that the trial court erred by refusing to suspend criminal proceedings pursuant to section 1368, et seq., and commit him to the Department of Mental Health.  (Petition, at (5), 6-10.)

Petitioner presented this claim to the Fifth District Court of Appeal and California Supreme Court.  Because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson,

1   217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court

2   opinion in determining whether state court's rejection of petitioner's claims was contrary to or an

3   unreasonable application of federal law under § 2254(d)(1)).

4          A criminal defendant may not be tried unless he is competent, as a conviction of a

5   defendant who is legally incompetent is a violation of due process.  See Cacoperdo v.

6   Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994).  If the trial court has a good faith doubt

7   concerning the defendant's competence, due process mandates that the court order a psychiatric

8   evaluation or conduct a competency hearing.  See Cacoperdo, 37 F.3d at 510; see also Davis v.

9   Woodford, 384 F.3d 628, 644 (9th Cir. 2004).  There is a good faith doubt of a defendant's

10  competence only upon a showing of substantial evidence of incompetence.  Cacoperdo, 37 F.3d

11  at 510.  California follows the same standards under sections 1367 and 1368.  See People v.

12  Pennington, 66 Cal.2d 508, 5`7 (1967); People v. Stankewitz, 32 Cal.3d 80, 92 (1982).  There are

13  several factors the Court may utilize to determine whether a competency hearing is necessary,

14  including evidence of a defendant's irrational behavior, his demeanor at trial, and any prior

15  medical opinion on competence to stand trial.  See Loyola-Dominguez, 125 F.3d 1314, 1318 (9th

16  Cir. 1997) (citing Drope v. Missouri, 420 U.S. 162, 171 (1975)).

17          "The test for competency to stand trial is whether the defendant 'has
        sufficient present ability to consult with his lawyer with a reasonable degree of
18      rational understanding - - and whether he has a rational as well as factual
        understanding of the proceedings against him.'" Dusky v. United States, 362 U.S.
19      402, [] (1960) (per curiam); Chavez v. United States, 656 F.2d 512, 518 (9th Cir.
        1981).
20
21  Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir. 1985).  On habeas review, a state court's

22  competency finding is entitled to a presumption of correctness.  Demosthenes v. Baal, 495 U.S.

23  731, 735 (1990).

24          The Fifth District Court of Appeal properly set forth the factual and procedural

25  background regarding this claim:

26          We set forth the factual and procedural background relevant to the
        question of [Petitioner's] competency. [Petitioner] was arraigned on June 9, 2003.
27      At his arraignment, [Petitioner] asked the court if it was aware that he was a
        prince of a royal family. [Petitioner] told the court he wished to represent himself.
28      The court questioned [Petitioner] about his wish to represent himself and asked if
        it was his desire to present a defense of insanity.  When [Petitioner] replied that he

                                                    6

was going to proceed on a defense of insanity, the court refused his request to represent himself and appointed an attorney to represent him. Immediately after this appointment, defense counsel requested that two doctors be appointed to examine [Petitioner] pursuant to Penal Code section 1368. The trial court granted this request and suspended criminal proceedings. [Petitioner] then requested the court to issue an order to have the camera inside of his skull removed. He claimed the monitoring device was implanted in his head by his father and the Army Corps of Engineers. The court denied his request.

Two doctors examined [Petitioner]. One found him competent; the other found him incompetent to stand trial. The court appointed a third doctor to evaluate [Petitioner]. A competency hearing was held by the court on August 25, 2003. The court considered the reports from Dr. Taylor and Dr. Zimmerman. Their reports were similar and found that, although [Petitioner] appeared to understand the legal system and the charges against him, he was delusional and this could impair his ability to work with his attorney. They concluded he was incompetent to stand trial.

[Petitioner's] mother testified at the hearing that [Petitioner] started exhibiting unusual behavior beginning in November of 2002 after he had been incarcerated for an unrelated offense. [Petitioner] claimed he was royalty, said strange things, and said that people could hear his thoughts. [Petitioner] had not received any prior mental health treatment. [Petitioner's] mother stated that [Petitioner] was aware he was in jail and was represented by an attorney.

[Petitioner] testified at the hearing. He reiterated that he was the Royal Monarch and had a camera in his eye. He said that the United States government had sabotaged his food and his car. He admitted he set his father's (the king's) house on fire. On cross-examination, [Petitioner] testified he understood the charges against him, he could recall the circumstances of the crime, he could identify his attorney and the attorney's role in the court proceedings, and he knew the roles of the judge and the district attorney. The court questioned [Petitioner], asking him if he knew what his attorney was supposed to be doing, if he knew what the district attorney's job is in the courtroom, and if he knew the nature of the hearing currently underway. [Petitioner] correctly answered these questions. The court asked [Petitioner] if he wanted the court to find him competent. He responded yes; in so answering, he wanted the court to issue an order to take the camera out of his eye.

Dr. Della Porta filed a report and also testified at trial. It was Dr. Della Porta's opinion that [Petitioner] fabricated symptoms of his mental illness and was competent to stand trial. Dr. Della Porta reviewed the reports of the other doctors. Dr. Della Porta found Dr. Zimmerman's report of no value because he failed to come to a diagnosis. He discounted Dr. Taylor's report because it appeared to be merely a "self report" of [Petitioner's] condition with nothing about the diagnostic indicators for the diagnosis.

Dr. Della Porta found [Petitioner] was malingering based on several factors. The first factor was that those who are mentally ill are often reluctant to discuss their illness, yet [Petitioner] immediately began talking about his camera issue and that he is royalty. Next, it was important to Dr. Della Porta's determination of [Petitioner's] competency that there was no history of mental illness. Additionally, [Petitioner] indicated he thought he would live at a mental hospital but not in prison, thus setting forth a secondary gain for his behavior. Also, [Petitioner's] affect was normal. Dr. Della Porta found it unusual that [Petitioner] did not know the time of the onset of his mental illness. Finally, Dr. Della Porta found nothing in the police reports indicating [Petitioner] suffered from a mental illness. At the time he was interviewed by police, he did not come forward with information about his eye camera or his royal background.

The court found that, although on some subjects [Petitioner] may be

7

deranged, he was capable of understanding the nature and purpose of the proceedings against him and was able to assist his attorney in conducting a defense in a rational manner.

The preliminary hearing was held on October 20, 2003.  At the close of the hearing [Petitioner] stated his desire to plead guilty.  The court advised [Petitioner] to talk to his counsel before he made such a decision.

At his arraignment on October 22, 2003, [Petitioner] stated that he wanted to enter a plea of not guilty and did not want to go forward with an insanity plea. [Petitioner] stated that he had been trying to act crazy to get out of his situation. The court continued the hearing.

At the trial setting hearing on November 5, 2003, [Petitioner] refused to come to court.  His counsel indicated he might renew a request for Penal Code section 1368 proceedings to be instituted.  The court stated that it was not going to suspend criminal proceedings at this time, but appointed Dr. Zimmerman to talk with [Petitioner] regarding defense counsel's concern that [Petitioner] may have decompensated.

[Petitioner] refused to talk with Dr. Zimmerman.  Dr. Zimmerman wrote a report criticizing the report of Dr. Della Porta and again concluding [Petitioner] was not competent to stand trial.

At the trial confirmation hearing on November 25, 2003, defense counsel stated that he believed that [Petitioner] was not able to assist him at trial.  The court stated that it had previously found [Petitioner] competent to stand trial.  In the interim, [Petitioner] stated on the record that he was malingering when he was making the comments that he had made.  The court concluded that there "is not a doubt in the Court's mind as to the [Petitioner's] competency.  The Court finds based on its knowledge of the entire case that [Petitioner] is competent to stand trial."

On December 8, 2003, [Petitioner] waived his right to a jury trial.  On the day set for trial the court was told that [Petitioner] was going to plead guilty. Defense counsel stated that during the pendency of the case he had some concerns regarding [Petitioner's] mental health; however, while he still had concerns about [Petitioner's] mental health, he did not believe it rose to the level of the requirements of Penal Code section 1368.

[Petitioner] told the court that he needed to be locked up or he needed the camera taken out of his eye.  When the court inquired regarding the proposed guilty plea, [Petitioner] stated that he wanted to enter a plea of not guilty because he was not guilty. [Petitioner] proceeded to trial before the court without a jury.

[Petitioner] testified on his own behalf.  At the outset defense counsel asked that [Petitioner] be allowed to testify in a narrative form because defense counsel was not able to clearly identify issues that [Petitioner] wished to address. [Petitioner] testified regarding his royal background and the camera in his eye, as well as the crimes he committed.

The court found [Petitioner] guilty as charged.  The court stated that although [Petitioner's] reasons for doing what he did were delusional, he did form the required specific intent to commit the crimes.

[Petitioner] claims the trial court erred when it did not suspend criminal proceedings and commit him to the Department of Mental Health.  He contends that the events leading up to and following the issuance of Dr. Zimmerman's second report demonstrate the error.

[Petitioner] argues that when the trial court requested Dr. Zimmerman to conduct a second evaluation, it implicitly rejected Dr. Della Porta's finding of malingering.  When Dr. Zimmerman again found [Petitioner] mentally incompetent, the court was left only with the mental health reports that concluded that he could not assist in his legal defense in a rational manner. [Petitioner] claims it was error for the trial court to reject Dr. Zimmerman's second report.

. . . . .

The court was acting out of an abundance of caution and at the request of defense counsel when it had Dr. Zimmerman do a second report. Dr. Zimmerman was not able to interview [Petitioner] and did not have any new information for his conclusion that [Petitioner] was incompetent. We do not find that the court's decision to have Dr. Zimmerman conduct a second examination was a rejection of its earlier decision, particularly since the court declined to suspend criminal proceedings at that time. In addition, the court did not disregard that [Petitioner] suffered from a mental condition; it found that [Petitioner] was competent to proceed to trial. The manifestations of [Petitioner's] mental state did not change from the outset; he continued to talk about the camera in his eye and that he was royalty.

(Lodged Doc. No. 4, at 3-8.)

Here, as thoroughly summarized by the California Court of Appeal, the trial court found based on representations made in court there was substantial evidence as to whether Petitioner was competent to continue with the criminal proceedings. The trial court conducted a thorough hearing to determine whether Petitioner was competent to proceed with the criminal trial. In addition to thoroughly questioning Petitioner regarding his understanding of the nature of the criminal proceedings, the trial court considered the reports of three experts it appointed to evaluate Petitioner and concluded that Petitioner was competent to stand trial. (RT 331-334, 349; CT 29.) The fact that two of the three court appointed experts opined that Petitioner was incompetent to stand trial, Dr. Della Porter concluded otherwise finding several factors lead to his conclusion that Petitioner was malingering. (RT 340-341.) The trial court was free to determine how much weight and credibility to give to these experts' reports. This Court is presently bound by that finding as Petitioner has failed to overcome § 2254(d)'s presumption of correctness, and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.[5]

D.    Trial Court's Refusal to Hold Subsequent Competency Hearing

Petitioner contends further that following his trial testimony, the court should have suspended the criminal proceedings and committed him to the Department of Mental Health or had him reevaluated by mental health experts.

---

[5] Petitioner's claim in his traverse that Doctors Taylor and Zimmerman were not allowed to testify at the competency hearing is unfounded. Although these doctors did not testify at the competency hearing, their reports were appropriately presented and considered by the trial court. (See RT 305-306, 346-347.)

1    As with Petitioner's previous claim, this claim was presented to the Fifth District Court of

2    Appeal and denied summarily by the California Supreme Court.  Accordingly, this Court looks

3    through to the California Court of Appeal's reasoned decision.   Ylst v. Nunnemaker, 501 U.S. at

4    804-05 & n. 3.

5    In rejecting Petitioner's claim, the California Court of Appeal held:

6            In a continuation of the above argument, [Petitioner] contends the court
     erred when it did not hold a further competency hearing or commit him to the
7    Department of Mental Health based on his trial testimony and the events
     preceding it.  In particular, [Petitioner] cites numerous instances demonstrating
8    mental instability, such as: he presented bizarre testimony at trial, took adversarial
     positions against counsel, sought to remove his counsel from the case, withdrew a
9    not guilty by reason of insanity plea, demanded to plead guilty, refused to
     cooperate with Dr. Zimmerman, and withdrew from a favorable plea bargain.
10   [Petitioner] argues that the court took action indicating that it questioned his
     competency, such as having him reevaluated, not revisiting his request to
11   represent himself, permitting him to testify in the narrative, questioning
     [Petitioner] at trial, and expressing doubts about his mental state at sentencing.
12           We note that many of the above behaviors listed as unusual are common
     occurrences in trials. [Petitioner] frequently take adversarial positions against
13   counsel, seek to remove them from trial, and change their plea.  The court
     never doubted that [Petitioner] exhibited some unusual behavior, but it found that
14   he was competent to stand trial.  Although [Petitioner] exhibited some bizarre
     behavior, the record does not demonstrate the trial court erred in finding him
15   competent or erred in continuing in this belief throughout the course of the trial.
     (Lodged Doc. No. 4, at 8-9.)

16

17   As Respondent argues, a second hearing was unnecessary because no new evidence was

18   offered to conclude Petitioner was incompetent.  Specifically, the trial court stated, "There's no

19   doubt in the Court's mind as to the defendant's competency." (RT 979.)  There simply was not

20   substantial evidence that Petitioner was incompetent; as such, the court did not err in refusing to

     hold a second competency hearing.  Amaya-Ruiz v. Stewart, 121 F.3d 486, 489 (9th Cir. 1997).
21
     Based on Dr. Della Porta's report that Petitioner was malingering with no history of mental
22
     illness (RT 340), along with Petitioner's admission on the record that he was malingering (RT
23
     10/22/03 at 933-935), the trial court did not have, nor should it have had, a bona fide doubt as to
24
     Petitioner's competency.  The trial court was not presented with new evidence of Petitioner's
25
     alleged incompetence, and the trial court carefully considered Petitioner's behavior throughout
26
     the criminal proceeding in coming to its conclusion that Petitioner was not incompetent to stand
27
     trial.  (See RT 979.)  The state courts' determination of this issue was not contrary to, or an
28

1  unreasonable application of, clearly established Supreme Court precedent.

2  E.    Insufficient Evidence to Support Carjacking Conviction

3         Petitioner contends that the prosecution failed to meet its burden of proving beyond a

4  reasonable doubt that Petitioner was guilty of carjacking.  Petitioner claims the victim's

5  testimony reveals "the automobile in question was not taken against the will of the person in

6  possession of it as required by section 215."  (Petition, at (6), 18-23.)

7         The law on insufficiency of the evidence claim is clearly established.  The United States

8  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

9  federal court must determine whether, viewing the evidence and the inferences to be drawn from

10 it in the light most favorable to the prosecution, any rational trier of fact could find the essential

11 elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

12 Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

13        This claim was presented to the Fifth District Court of Appeal and denied summarily by

14 the California Supreme Court.  Accordingly, this Court looks through to the California Court of

15 Appeal's reasoned decision.   Ylst v. Nunnemaker, 501 U.S. at 804-05 & n. 3.

16        In rejecting Petitioner's claim on direct appeal, the Fifth District Court of Appeal held, in

17 part, as follows:

18            Carjacking as defined in Penal Code section 215 is "the felonious taking of
          a motor vehicle in the possession of another, from his or her person or immediate
19        presence, or from the person or immediate presence of a passenger of the motor
          vehicle, against his or her will and with the intent to either permanently or
20        temporarily deprive the person in possession of the motor vehicle of his or her
          possession, accomplished by means of force or fear."
21            . . . . . . .
            [Petitioner] claims that, unlike the victim in Coryell, Russell interjected
22        himself into the criminal episode and consented to the taking of his car by offering
          it without a demand from [Petitioner].  We do not find Coryell distinguishable.
23        Just as in Coryell, [Petitioner] here accosted one victim (Renae); the second
          victim (Russell) witnessed the attack and became frightened, giving up possession
24        of a vehicle.  Additionally, in this case, [Petitioner] demanded the car keys and
          continued to demand the keys even after Russell intervened.  The fact that he
25        ended up taking Russell's car instead of Renae's car does not defeat his
          conviction.  Russell was afraid; his fear was what allowed [Petitioner] to
26        accomplish the taking of his car.  (See People v. Brito (1991) 232 Cal.App.3d
          316, 325-326, where the court held the scope of a robbery is not limited to the
27        items identified at the time the robber initially applies the force.)
            [Petitioner] demanded car keys.  Although he did not specifically demand
28        Russell's keys, the inference is inescapable that [Petitioner] was demanding

                                          11

1    transportation and that the taking of Russell's car was accomplished by means of
     [Petitioner's] threat of force or fear.  Russell was frightened into surrendering his
2    car to [Petitioner].  Substantial evidence supports the carjacking conviction.

3    (Lodged Doc. No. 4, at 9-11.)

4           Petitioner's claim that he did not take Russell's vehicle without his consent, is simply

5    nonsensical.  Russell testified that when he approached the scene of the incident, Petitioner was

6    demanding the keys to his wife's vehicle.  Russell immediately got in front of his wife,

7    attempting to shield her from Petitioner who was displaying a firearm and repeatedly demanding

8    the keys to the pickup.  After Russell's wife refused to give up her keys, Russell fearing for the

9    safety of himself and his wife, told Petitioner to take his car.  (RT 1281.)  As Respondent

10   correctly argues, there is little, if any, doubt that Russell and Renae would have retained

11   possession of their vehicle had Petitioner not demanded the keys while displaying a firearm.  As

12   the evidence overwhelming demonstrates that Petitioner took the vehicle without Russell's

13   consent, the state court's disposition is not an unreasonable application of the Jackson standard

14   and Petitioner's claim must be denied.

15                                              ORDER

16          Based on the foregoing, it is HEREBY ORDERED that:

17          1.      The instant petition for writ of habeas corpus is DENIED;

18          2.      The Clerk of Court shall enter judgment in favor of Respondent; and

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

3.     The court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c);
Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where
the applicant has made "a substantial showing of the denial of a constitutional
right," i.e., when "reasonable jurists would find the district court's assessment of
the constitutional claims debatable or wrong"; Hoffman v. Arave, 455 F.3d 926,
943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable
jurists would not find it debatable that the state courts' decision denying
Petitioner's petition for writ of habeas corpus were not "objectively
unreasonable."


     IT IS SO ORDERED.

**Dated:     November 7, 2007**                    _____ **/s/ Dennis L. Beck** _____
                                                   UNITED STATES MAGISTRATE JUDGE